**IN THE UNITED STATES DISTRICT COURT**
**FOR THE NORTHERN DISTRICT OF ILLINOIS**
**EASTERN DIVISION**

| | |
|---|---|
| **DARA A. TEAGUE,** ) | |
| ) | |
| **Plaintiff,** ) | |
| ) | **No. 13 C 6390** |
| **v.** ) | |
| ) | **Magistrate Judge Michael T. Mason** |
| **CAROLYN W. COLVIN, Acting** ) | |
| **Commissioner of Social Security,** ) | |
| ) | |
| **Defendant.** ) | |

**MEMORANDUM OPINION AND ORDER**

MICHAEL T. MASON, United States Magistrate Judge:

Claimant Dara Teague ("Teague" or "Claimant") brings this motion for summary judgment [20] seeking judicial review of the final decision of the Commissioner of Social Security ("Commissioner"). The Commissioner denied Teague's claim for disability insurance benefits under the Social Security Act, 42 U.S.C. §§ 416(i) and 423(d). The Commissioner has filed a cross-motion for summary judgment [24], asking that this Court uphold the decision of the Administrative Law Judge. This Court has jurisdiction to hear this matter pursuant to 42 U.S.C. § 405(g). For the reasons set forth below, claimant's motion for summary judgment is granted and the Commissioner's motion for summary judgment is denied.

**I. BACKGROUND**

**A. Procedural History**

Teague filed her application for benefits on August 18, 2010. (R. 126-27.) She alleges an onset of disability of July 29, 2007 due to chronic depression, fibromyalgia, rheumatoid arthritis, high cholesterol, and a sleep disorder. (R. 71.) Her application

was denied initially on November 15, 2010, and again on January 27, 2011, upon a timely request for reconsideration. (R. 60-64, 66-71.) On March 16, 2011, Teague filed a request for a hearing. (R. 73-75.) On February 1, 2012, Teague testified before Administrative Law Judge Janice M. Bruning (the "ALJ"). (R. 34-57.) On April 27, 2012, the ALJ issued a written decision denying Teague's disability claim. (R. 15-33.) She filed a timely request for review with the Appeals Council. (R. 14.) On July 13, 2013, the Appeals Council denied Teague's request for review, at which time the ALJ's decision became the final decision of the Commissioner. (R. 1-4.) This action followed and the parties consented to the jurisdiction of this Court.

### B. Medical Evidence

#### 1. Treatment for Physical Ailments

On April 11, 2007, Teague sought treatment in the ER at Adventist Hinsdale Hospital ("Adventist") for moderate pain in her hands, legs, and feet, which developed the day before. (R. 292-94.) She described a history of fibromyalgia and hypothyroidism, though she had not been taking her thyroid medication recently because she did not have a doctor. (R. 292, 296.) She was diagnosed with bilateral myalgia and hypertension and provided medication. (R. 295-96.)

Teague was admitted to Adventist in July 2007 for worsening facial rash that had spread to her arms and chest. (R. 303.) She complained of muscle and joint pain, as well as chest pain. (R. 313, 315.) The examining doctor observed inflammation of the hands and wrists with decreased range of motion, pain on movement of the elbows and shoulders, and mild pain and swelling of the knees. (R. 313.) He noted a high probability of rheumatoid arthritis ("RA"). (R. 314.) X-rays of the hands and wrists were

unremarkable.  (R. 322-23.)  Chest x-rays showed no acute cardiopulmonary abnormalities and an EKG was within normal limits.  (R. 321,324.)  Teague's rash improved with medication.  (R. 303.)  She was discharged and advised to obtain a stress test.  (*Id.*)

Teague continued to seek treatment intermittently at Adventist for facial rash, chest pain, vaginal pain, earaches, sore throat, back pain, and general body aches through 2009.  (R. 335-450.)

In August 2007, a newly pregnant Teague began treatment at Loyola University Medical Center ("Loyola").  (R. 523-26.)  She reported recent diagnoses of diabetes and RA.  (R. 523.)  She described a history of hypertension, recurring chest pain, hypothyroidism, facial rash, and depression, but denied being depressed at the time. (*Id.*)  Her initial visits concerned management of her ailments as they related to her pregnancy.  (R. 520-25.)

On September 6, 2007, Teague reported having trouble staying asleep, stating that she was only getting three hours of sleep at a time.  (R. 519.)  She had been hearing voices for the past six months, which were becoming more persistent.  (*Id.*) She explained that she knew when the voices were coming and that they did not tell her to harm herself or others.  (*Id.*)  The examining physician opined that the voices and sleep disturbances were likely due to steroid use for her facial rash, but referred Teague to a psychiatrist for further evaluation.  (R. 520.)  She also referred Teague to the rheumatology department for further work up regarding her joint pain and rash.  (R. 519-20.)  Also around this time, Teague had a cardiac consultation for complaints of worsening chest pain.  (R. 516-17.)  The examining physician opined that her symptoms

might be caused by gastrointestinal issues.  (R. 515.)  An EKG a few months later was within normal limits and the physician again doubted that the chest pain was cardiac in origin.  (R. 508.)  An echocardiogram was within normal limits.  (R. 577-78.)

Teague returned to Loyola in late September 2007 for a rheumatology consultation.  (R. 512-13.)  She reported that she had suffered from joint pain for over five years, mainly in her feet, ankles, knees, and hands, and described her recent rash. (R. 512.)  The doctor saw no inflammation of the hands, elbows, or ankles, mild tenderness to palpation of the second metacarpophalangeal joints bilaterally, and bilateral crepitus in the knees.  (R. 513.)  Though the examining physician noted an elevated rheumatoid factor upon previous testing, she did not believe Teague suffered from RA.  (*Id.*)  Further testing was ordered.  (*Id.*)  She returned to Loyola frequently over the next few months for check-ups regarding her pregnancy, diabetes, hypothyroidism, joint pain, and chest pain.  (R. 493-511.)

On December 21, 2007, Teague followed up with the rheumatology department at Loyola, complaining of continued joint pain and swelling of the hands that prevented her from using silverware or opening bottles.  (R. 502-04.)  The doctor observed a decreased range of motion due to swelling, and slightly decreased hand grip.  (R. 503.) The etiology of Teague's symptoms remained unclear.  (R. 504.)  The doctor opined that it could be early RA or scleroderma, and prescribed prednizone.  (*Id.*)  She showed improvement in her hands a few weeks later.  (R. 500.)

On April 8, 2008, shortly after having her baby, Teague began treatment with Dr. Shazia Khan at Loyola.  (R. 487.)  She complained of joint swelling and tenderness in the hands wrist and back, as well as an increase in memory loss over the past two

4

years.  (*Id.*)  She was not taking insulin or steroids, and her blood sugar was well controlled at home.  (*Id.*)  She exhibited a flat affect and some swelling in the hands.  (R. 489.)  Dr. Khan referred her to neurology.  (R. 492.)

At a follow up appointment with her rheumatologist, Teague was told that testing for RA was negative and that her pain was likely related to her depression.  (R. 487.)  She became very upset and was encouraged to see her psychiatrist more regularly.  (*Id.*)  She was also prescribed Vicodin.  (*Id.*)

Teague met with neurologist Dr. Melissa Armstrong on April 14, 2008.  (R. 479-85.)  Teague explained that she often forgot directions while driving, or forgot people that she had previously met.  (R. 480.)  She was maintaining a detailed calendar to remember her appointments or to pay the bills.  (*Id.*)  Physical and neurological exams were essentially unremarkable.  (R. 480-81, 484-85.)  Dr. Armstrong informed Teague that the vast majority of memory problems for individuals in her age group could be attributed to a psychiatric diagnoses.  (R. 481.)  Teague expressed frustration upon hearing this.  (*Id.*)  Given her frustration, Dr. Armstrong ordered an MRI of the brain and further neurological work-up.  (*Id.*)

At a routine post-partum follow up, Teague reported feeling overwhelmed.  (R. 477.)  She believed that her rheumatologist was "blowing her off" and she was referred to another doctor.  (R. 477-78.)  Her pain medications were providing minimal relief.  (R. 478.)  She was feeling better the following week.  (R. 476.)  Her hypertension was well controlled at an appointment with Dr. Khan, and she was advised of the importance of diet and exercise.  (R. 475.)

On May 30, 2008, Teague returned for a neurological follow up with Dr.

Armstrong. (R. 473-74.) She told Dr. Armstrong that she was feeling "so-so" and was recently diagnosed with RA at a different hospital. (R. 473.) The MRI and lab studies were essentially unremarkable, and Dr. Armstrong again attributed Teague's memory problems to her depression and chronic pain. (R. 474, 564.) Dr. Armstrong advised continued psychiatric treatment and encouraged Teague's use of organizational techniques. (*Id.*)

On July 8, 2008, Teague followed up with Dr. Khan after her facial rash reappeared. (R. 470-71.) Dr. Khan increased her steroid prescription for the rash. (*Id.*) Teague returned on September 22, 2008, at which time Dr. Khan noted that medications were not producing side effects. (R. 469.) Teague's hypertension remained well controlled, and Dr. Khan discussed the ups and downs of her depression. (R. 470.)

In November 2009, Teague told Dr. Khan she was suffering from pain all over. (R. 461.) Dr. Khan again discussed the importance of proper diet and exercise. (R. 463.) Teague was treated in the ER at Loyola in January 2010 for generalized pain all over her body. (R. 614.) It was determined to be a possible fibromyalgia flare. (*Id.*) Teague was given pain medication and discharged to home. (*Id.*)

Teague was examined at University Rheumatologists on March 16, 2010 for a second opinion about her pain. (R. 268.) She complained of constant, moderate to severe pain in her hands, knees, feet, and arms. (*Id.*) She said she was unable to use the computer or wear tight shoes. (*Id.*) Vicodin helped a little. (*Id.*) Upon physical examination, 18/18 diffuse tender points were observed and there was no sign of synovitis or deformities. (R. 269.) The examining physician noted that Teague's

symptoms were consistent with fibromyalgia. (*Id.*) He saw no evidence of RA on physical exam, but stated that "some symptoms are suggestive" of such. (*Id.*) He ordered blood work and x-rays of the hands and feet, which ultimately proved unremarkable. (R. 269, 281-82.)

Teague returned to University Rheumatologists on March 30, 2010, at which time she continued to complain of pain affecting most of her joints. (R. 271.) She reported increased swelling in the hands, occasionally in the arms, and increased insomnia. (*Id.*) Upon physical examination, Teague exhibited a full range of motion. (R. 272.) The doctor noted that blood work showed no evidence of connective tissue disorder and that he again saw no evidence of RA. (*Id.*) He recommended exercise and weight loss. (*Id.*) On June 30, 2010, Teague complained of severe pain, particularly in her left shoulder. (R. 274.) A Neer's/Hawkins test of the left shoulder was positive; range of motion was full, but with pain. (R. 275.) She was given a steroid injection in the left shoulder. (*Id.*) Her symptoms persisted at her next appointment, and she said she was having a hard time taking care of her son. (R. 655.) She was referred to a pain clinic. (R. 656.)

On July 9, 2010, Teague met with Dr. Khan complaining of pain in her left shoulder that radiated to her arm and fingers. (R. 458.) The pain began two days after receiving the steroid injection. (*Id.*) Her blood pressure was well controlled, but she had not been checking her blood sugar. (*Id.*) She exhibited decreased grip strength in her left, dominant hand. (R. 459.) Dr. Khan started her on Flexeril for shoulder pain. (R. 460.) Her shoulder was feeling better a few weeks later, but her ankles were bothering her. (R. 455.) Dr. Khan discussed the possibility of stress exacerbating her

pain.  (R. 457.)

In November 2010, Teague was still suffering from aches and pains.  (R. 780.)
Recent liver function testing was abnormal.  (*Id.*)  An ultrasound showed results
consistent with diffuse fatty infiltration of the liver and she was advised to follow up with
the Liver Clinic.  (R. 786-87.)  A sleep study showed mild obstructive sleep apnea.  (R.
794.)  It was recommended that Teague consult with a sleep clinic, be screened for
restless leg syndrome, and avoid alcohol, narcotic, and sedative medications.  (*Id.*)  On
December 10, 2010, Teague saw Dr. Khan and complained of a fibromyalgia flare-up.
(R. 779.)  She told him she was having difficulty taking care of her children and that her
parents were helping.  (*Id.*)  Flexeril was providing minimal relief.  (*Id.*)

Teague's liver function tests remained elevated in February 2011.  (R 993.)  She
had not been checking her blood sugar at home.  (*Id.*)  On March 14, 2011, Teague
reported to Dr. Khan that she was feeling very overwhelmed due to numerous stressors.
(R. 985.)  She reported pain all over and worsening depression.  (*Id.*)  She was
encouraged to follow up with the psychiatric department.  (*Id.*)

Teague had a consultation with the Liver Clinic later that month.  (R. 976-79.)
The physician determined that Teague's elevated liver function tests were most likely
due to non-alcoholic fatty liver disease in light of her other medical ailments.  (R. 978.)
He ordered additional testing, and recommended weight loss and exercise, among
other things.  (*Id.*)  If her liver function tests remained elevated in six months, he would
consider a liver biopsy.  (*Id.*)

Teague had another fibromyalgia flare up in September 2011.  (R. 963.)  She
described a burning sensation all over, painful to touch.  (*Id.*)  Again, Flexeril was

providing minimal relief.  (*Id.*)  Dr. Khan recommended physical therapy.  (R. 968.)

Records show that Teague underwent physical therapy in September 2011.  (R. 938.)  She reported difficulty getting out of bed, climbing steps, and doing chores.  (*Id.*)  She said she could sit for two hours, stand for thirty minutes, and walk for 1/4 mile.  (*Id.*)  Teague described her pain as sharp and rated it a 2/10 at best and an 8/10 at worst.  (*Id.*)  She exhibited a slow gait and decreased range of motion of the lumbar spine.  (R. 939.)  Straight leg test was positive on both sides.  (R. 942.)  The therapist determined that Teague would benefit from physical therapy and her rehabilitation potential was "good."  (*Id.*)  Over the next few months, Teague showed progress, but voiced continued complaints of pain.  (R. 945-46.)

Teague was admitted to Adventist in October 2011 for cellulitis on the inner thighs, secondary to severe candidiasis caused by uncontrolled diabetes.  (R. 909.)  She was educated on the importance of diabetes management and discharged to her physicians at Loyola.  (*Id.*)  A few days later, Teague followed up with Dr. Khan as directed.  (R. 955.)  Her infection had resolved, though her blood sugar had not improved.  (*Id.*)  Dr. Khan increased her medications.  (R. 956.)  She was feeling better a few weeks later.  (R. 948.)

### b.  Treatment by Mental Health Professionals

On September 24, 2007, Teague, then thirteen weeks pregnant, had an initial psychiatric consultation with nurse Mary Kenny at Loyola.  (R. 1014-17.)  She admitted to hearing voices every other week during the past year, which caused stress and a sense of panic.  (R. 1014.)  She described the voices as varying in pitch and reported they appeared when she felt stressed.  (*Id.*)  The voices had increased after her recent

July 2007 hospitalization at Adventist.  (*Id.*)  Teague claimed to initially "smell a weird odor" lasting two to three minutes, after which she would develop a sense of panic, and then hear the voices for approximately two to three minutes.  (*Id.*)

Teague rated her depression as a 5/10, and described occasional feelings of hopelessness, and increased forgetfulness.  (R. 1014.)  She denied suicidal or homicidal ideations.  (*Id.*)  Teague stated that she slept about four hours per night, with some napping during the day, and suffered from fatigue, low energy, and irritability.  (*Id.*)  She denied feeling anxious or having any bipolar symptoms.  (*Id.*)  Teague also denied experiencing any paranoia or visual hallucinations.  (*Id.*)

In her report, Ms. Kenny noted multiple stressors including: (1) separation and order of protection from her husband after a physical altercation; (2) recent medical issues such as thyroid disorder, fibromyalgia, hypertension, diabetes, and potentially RA; (3) a daughter with sickle cell anemia who constantly requires medical treatments; and (4) feeling as though she is putting too much pressure on her parents to help her.  (R. 1014-15.)  Ms. Kenny recommended Teague return for therapy sessions.  (R. 1017.)

Teague returned for a follow up a few weeks later.  (R. 1013).  She exhibited good eye contact, was alert, oriented, and her thought processes were logical and sequential.  (*Id.*)  She was under stress due to her daughter's recent hospitalization and her relationship with her husband.  (*Id.*)  She complained that her hair was falling out due to stress.  (*Id.*)  Ms. Kenny assessed Teague's problems using a 0-10 scale with 0 representing no symptoms, 1 indicating mild problems, 5 indicating moderate problems, and 10 indicating extreme problems.  (*Id.*)  She also assigned Teague a rating for

overall functioning.[1]  On this visit, Ms. Kenny rated Teague's depression and low energy level at 6, anxiety at 5, and overall functioning at 7.  (*Id.*)  Ms. Kenny assessed impaired coping and altered function and recommended additional therapy.  (*Id.*)  The attending physician agreed with this course of treatment and noted that Teague did not display symptoms consistent with bipolar disorder.  (R. 1013-14.)  He recommend SSRIs but Teague was somewhat reticent.  (R. 1014.)

Teague returned to see Ms. Kenny on January 4, 2008.  (R. 1012).  She displayed poor eye contact, but was otherwise alert and oriented.  (*Id.*)  She cried through much of the session, saying that her depression had "taken a turn for the worse".  (*Id.*)  She had recently thought of cutting her wrists, but pushed the thought out of her mind because of her children.  (*Id.*)  Her relationship with her husband remained strained.  (*Id.*)  Using the same rating scale described above, Ms. Kenny rated Teague's depression, irritability, and low energy level at 7, anxiety at 5, and overall functioning at 5.  (*Id.*)  Ms. Kenny referred Teague to psychiatrist Dr. Edwin Meresh.  (*Id.*)

On January 8, 2008, Teague began treatment with Dr. Meresh.  (R. 1031.)  She was 28 weeks pregnant at the time and stated that she had been feeling sad and had experienced passive suicidal ideations on and off.  (*Id.*)  Dr. Meresh described her mood as depressed and her affect as constricted.  (*Id.*)  He rated her depression at 5, anxiety, low energy level, and insomnia at 2, and overall functioning at 5.  (*Id.*)  She had been

---

[1] On page 10 of Claimant's motion for summary judgment, Claimant states that a higher rating for "overall function" is indicative of "overall functioning compromise."  However, the medical record shows that higher ratings for "overall functioning" are associated with lower ratings for symptoms like "depression" or "low energy levels".  Thus, it is likely that a higher rating for "overall functioning" does not indicate dysfunction, but increased overall functioning.  (*Compare* R. 1012 (higher rated symptoms and lowest rated "overall functioning") *and* R. 1002 (lower rated symptoms and highest rated "overall functioning")).

taking Lexapro for depression but Dr. Meresh prescribed Zoloft. (*Id.*) Teague told Dr. Meresh she was feeling better a few weeks later. (R. 1028.) She was not crying anymore and "her sad mood" had subsided. (*Id.*) A mental status exam yielded normal results. (*Id.*) Dr. Meresh assessed depressive disorder, not otherwise specified, and advised Teague to continue on Zoloft and with therapy. (R. 1030-31.) In February 2008, Dr. Meresh reported that Teague seemed to be doing better and rated her depression at 1 and overall functioning at 7. (R. 1026.) All other categories were rated at 0, representing no symptoms. (R. 1028.)

On March 20, 2008, during her admission for child birth, Teague had an episode of anxiety that lasted for approximately two hours. (R. 594.) She reported feeling shaky, tremulous, and nervous, and heard voices for ten seconds. (*Id.*) During a psychiatric evaluation, Teague did not recollect what kind of voices they were or what they were saying, but knew they "were not telling me to do anything." (*Id.*) She said that she had heard the voices on and off for years, but that Zoloft had recently eliminated the voices and helped with her depression. (*Id.*) Teague's mother explained that over the past two years, Teague seemed to be experiencing memory problems. (*Id.*) A mental status exam was normal. (R. 597.) The psychiatrist assessed her GAF at 66, and determined that the voices did not appear to be psychotic in nature. (R. 598.) He recommended that Teague follow up with Dr. Meresh. (*Id.*)

Teague returned to see Dr. Meresh in April 2008 shortly after her baby was born. (R. 1025.) Her crying spells had recently decreased due to an increase in her Zoloft dosage. (*Id.*) She did complain of increased forgetfulness. (*Id.*) Dr. Meresh rated her depression and insomnia at 2, and her overall functioning at 7. (R. 1026.) He opined

that Teague's forgetfulness could be related to depression and said he would consider further work up if it continued. (*Id.*) The next month, Teague told Dr. Meresh she was tired of being in pain, but that she was recently told she did not have RA. (R. 1024.) Her mood was depressed and her affect constricted. (*Id.*) Dr. Meresh assessed major depressive disorder and made plans to taper Teague's Zoloft prescription and begin Cymbalta. (R. 1025.)

At her sessions with Ms. Kenny in May 2008, Teague was frustrated with her persistent pain and recent negative RA diagnoses. (R. 1010-11.) She complained of low energy, forgetfulness, poor appetite, and a desire to just "drive away." (R. 1011.) Her symptoms reached a rating of 4 in the categories of depression, loss of interest, low energy and insomnia, and her overall function was rated at 6. (R. 1010-11.) By the end of the month, she seemed less depressed and said she had been diagnosed with RA at a different facility. (R. 1009-10.) She reported reading for an hour a day, was checking her blood sugar more frequently, and planned to begin journaling. (R. 1010). At her next visits with Dr. Meresh and Ms. Kenny on June 9, 2008, Teague was still feeling better, but, in the heat of an argument, had briefly considered hitting her husband with her car as he walked in front of her. (R. 1023.) She denied current thoughts about hurting her husband, and was advised on the importance of controlling impulses. (R. 1023-24.) A month later, Teague said Cymbalta was helping her pain, but she was suffering from poor sleep, felt unable to cope, and was "tired of everything." (R. 1022.) She had suicidal ideations on and off. (*Id.*) Apart from a sad mood and constricted affect, a mental status exam was unremarkable. (*Id.*) Dr. Meresh rated her depression, low energy level, and insomnia at 1, and overall functioning at 7. (*Id.*)

13

Around the same time, Teague told Ms. Kenny she was having difficulty caring for her baby and that her husband was doing most of the work.  (R. 1009.)  She had been irritable and recently threw a pan at her husband during an argument.  (*Id.*)  She expressed concern about finances and stated she was looking into going back to work after being out on disability.  (*Id.*)  She was taking Vicodin daily to manage her pain and to help her sleep.  (R. 1008.)  She said she would not hurt herself because she could not leave the burden of caring for her children on her parents.  (R. 1009.)  Ms. Kenny rated Teague's depression, irritability, mood lability, loss of interest, and low energy level at 3, and her overall functioning at 6.  (R. 1008-09.)

On September 2, 2008, Teague told Dr. Meresh she was doing "so-so."  (R. 1021.)  She was still feeling sad and having occasional thoughts of suicide.  (*Id.*)  Dr. Meresh prescribed Zoloft again.  (R. 1022.)  The next day, appearing somewhat unkempt, Teague saw Ms. Kenny and reported feeling tired, poor concentration, and forgetfulness.  (R. 1007.)  Ms. Kenny pointed out that she had not been to therapy since July and emphasized the importance of coming to appointments.  (*Id.*)  Teague informed Ms. Kenny that she planned to return to work in November 2008.  (*Id.*)  Ms. Kenny rated Teague's depression, low energy level, loss of interest, and insomnia at 3, irritability and anxiety at 2, and overall functioning at 6.  (*Id.*)  Her symptoms were slightly improved a few weeks later and she devised a plan to find out about the process for going back to work.  (R. 1006.)  But at her next appointment, she expressed ambivalence about returning to work.  (*Id.*)

Teague returned to see Dr. Meresh in October and continued to complain of pain, fatigue, and forgetfulness.  (R. 1020.)  She was not ready to go back to work and

had moved back her tentative start date a few months.  (R. 1021.)  Dr. Meresh discontinued her Zoloft prescription and prescribed Wellbutrin to improve her memory and concentration.  (R. 1020.)  At a follow up visit, Dr. Meresh noted that Wellbutrin had helped.  (R. 1019.)  For the remainder of the year, Teague continued to report "so-so" moods, frustration with family members, pain, and low energy.  (R. 1002-05.)

When Teague was still feeling tired and depressed in January 2009, her return to work date was pushed back again.  (R. 1040-41, 1049.)  Dr. Meresh considered a sleep study.  (R. 1041.)  From a psychiatry standpoint, Dr. Meresh concluded that Teague was able to return to work in February, but noted that, due to her physical impairments, Teague did not think she could return until March.  (R. 1040.)  Dr. Meresh rated her overall functioning at an 8.  (R. 1039.)  In March, Teague was feeling somewhat better, except for continued sleep problems.  (R. 1039, 1048.)  Specifically, Teague told Ms. Kenny she had gotten in the habit of staying up all night and sleeping into the afternoon. (R. 1048.)  Ms. Kenny rated her depression, loss of interest, low energy level, and insomnia at 2, insomnia at 2, and overall functioning between 6 and 7.  (*Id.*)  Her overall functioning had improved a few weeks later, though she reported feeling unwanted and generally sad due to a number of stressors, and expressed concerns about vivid dreams.  (R. 1046-47.)  She hoped to begin working again in May.  (*Id.*)

Teague's mood improved over the next couple of months, with some continued complaints of physical ailments, lack of energy, and family stressors.  (R. 1042-45.)  Ms. Kenny noted that her functioning had improved as she was "more engaged in life around her."  (R. 1044.)  In May, Teague said she was ready to return to work, but did express some anxiety about the ability to perform the duties of her job.  (R. 1042.)  Dr.

15

Meresh agreed that she should return to work, but with some restrictions. (R. 1036.)

Teague was a no show at her July appointment, but returned to see Dr. Meresh in September. (R. 1034-35.) Her medication was helping, but she was still feeling depressed due to various stressors. (R. 1034.) She had not been following up with Ms. Kenny recently, and was advised to do so. (R. 1035.) She returned to see Dr. Meresh in November, at which time she reported feeling overwhelmed and tired, and her mood was down. (R. 1033-34.) It appears she had still not returned to see Ms. Kenny. (R. 1034.) Dr. Meresh rated her depression, low energy, and hypersomnia at 2, anxiety at 1, and overall functioning at 8. (*Id.*)

Teague returned to see Ms. Kenny in January 2010 after having not done so since May 2009. (R. 1073.) Her chronic pain continued and she found it difficult to get out of bed in the mornings. (*Id.*) Her parents were now taking her children on a regular basis. (*Id.*) She had been making plans, but cancelling them. (*Id.*) She explained that she had recently lost her disability benefits. (*Id.*) Ms. Kenny rated Teague's depression loss of interest, low energy and hypersomnia at 3, irritability at 1, anxiety at 2, and overall functioning at 6. (*Id.*) Teague voiced similar concerns during her next sessions with Ms. Kenny and Dr. Meresh. (R. 1062-63, 1072.) She was tearful and expressed that she sometimes wanted to "take off and leave." (R. 1072.) She did say that she had recently gone out with her friends and enjoyed herself. (*Id.*) Dr. Meresh noted that Teague was initially treated for depression post-partum, but was now being treated for depression related to pain. (R. 1063.) He prescribed Abilify, which she only took for one week due to nausea. (R. 1061, 1063.)

Similar complaints continued over the next few months, as Teague remained

overwhelmed with personal stressors and pain.  (R. 1068-71.)  She described an
incident when she thought someone was following her at the grocery store, and
explained that she was hearing voices again.  (R. 1070.)  Specifically, she said that
every other day she hears "a voice then there is a burning smell, [and] I can't move or
talk while this is going on."  (*Id.*)  She was doing the household shopping and trying to
stay on top of issues with her children.  (*Id.*)  In April, Teague told Ms. Kenny that she
had been diagnosed with fibromyalgia, instead of RA.  (R. 1067.)  She was frustrated
and just wanted "to be left alone."  (*Id.*)  The next month, Dr. Meresh noted that Teague
was still tired and planned to order a sleep study.  (*Id.*)

Teague missed her appointment with Dr. Meresh in August 2010, but saw him in
September.  (R. 1060.)  She voiced frustration that she had not been provided with pain
medication.  (*Id.*)  Dr. Meresh rated her depression, anxiety, insomnia, and hypersomnia
at 1, low energy at 3, and overall functioning at 8.  (*Id.*)  He made similar findings at her
next appointment in November.  (R. 1059.)

Teague missed another appointment in January 2011, but returned to see Dr.
Meresh in March.  (R. 1057-58.)  She was angry and irritable and her mother reported a
recent "meltdown" at her daughter's school.  (*Id.*)  Teague had been going on spending
sprees, and was suffering from poor sleep.  (*Id.*)  In the impression section, Dr.
Meresh's stated "R/O [rule out] bipolar disorder."  (*Id.*)  He wanted to taper Teague off
Wellbutrin and start her on Lamictal.  (R. 1058.)  Over the next few months, Teague
continued to feel tired and complained about pain.  (R.1054-57.)

On October 3, 2011, Teague reported feeling paranoid when going to stores,
stating that she believed people were watching her.  (R. 1052.)  She was having trouble

concentrating and was forgetful.  (*Id.*)  The next month she was still feeling paranoid, and was afraid to leave her home.  (R. 1051.)  Dr. Meresh started her on Risperdal. (*Id.*)  By January, her paranoia had somewhat decreased.  (R. 1050.)

Dr. Meresh completed a medical source statement in January 2012, stating that he had treated Teague once a month since 2008.  (R. 901-06).  Dr. Meresh assessed bipolar disorder for Axis I; deferred Axis II; diabetes, fibromyalgia, hypertension, hypothyroidism, and hypercholesterolemia for Axis III; psychological stressing for Axis IV; and assessed Teague's GAF at 55 for Axis V.  (R. 901.)  He said that Teague had been treated with medication, but had responded poorly, and suffered from fatigue.  (*Id.*) He identified paranoia, depression, and decreased concentration as the clinical findings demonstrating her impairments.  (*Id.*)  Her prognosis was "poor to moderate" and Dr. Meresh identified a laundry list of symptoms.  (R. 902.)

According to Dr. Meresh, Teague was seriously limited in her ability to perform certain aspects of unskilled work, and entirely unable to perform other aspects, such as maintain a regular schedule, due to bipolar disorder, mood swings, and impaired attention.  (R. 903.)  He also concluded that she would be unable to perform semi-skilled or skilled work, and would be unable to interact appropriately with the public.  (R. 904.)  He found stress tolerance to be an issue, and noted that Teague would find a number of work related demands stressful, such as deadlines, making decisions, working with other people, and getting to work regularly, among other things.  (R. 905.) Finally, Dr. Meresh was of the opinion that Teague would likely be absent from work more than four days every month due to her symptoms and that her impairments could be expected to last for at least twelve months.  (*Id.*)

18

## 2. State Agency Consultants

Teague underwent a psychiatric evaluation on October 27, 2010 with Dr. Herman Langner. (R. 745-47.) Teague explained that she suffered from depression, at times panic, and had no energy. (R. 745.) She said that she would not commit suicide because of her children, but sometimes "feels she does not want to go on." (*Id.*) Throughout the interview, Teague's affect was flat; she was at times tearful. (*Id.*) At the time, she was taking Cymbalta and Bupropion. (*Id.*)

Teague could not recall the date or address of the facility, but was able to repeat a series of five numbers forward. (R. 746.) She only recalled one out of three objects after three minutes. (*Id.*) She was able to identify five large U.S. cities and was aware of the current president. (*Id.*) Dr. Langner assessed depression/generalized anxiety and assigned Teague a GAF score of 50. (R. 747.) A psychiatric review technique indicated that Teague suffered from mild limitations in activities of daily living, maintaining social functioning, and maintaining concentration, persistence or pace. (R. 763.)

Teague underwent an internal medicine consultative exam with Dr. Mahesh Shah. (R. 749-52.) She described joint pain all over and explained that she has at times been diagnosed with fibromyalgia and at other times RA. (R. 749.) She said that she was unable to carry heavy objects or walk for long periods of time. (*Id.*) A physical examination revealed mild, vague tenderness in the shoulders, elbows, and knees without any swelling or deformity. (R. 751.) Range of motion was slow but full in all joints. (*Id.*) Teague moved slowly due to her joint pain, but did not use any assistive devices. (*Id.*) Otherwise, the exam was unremarkable. (*Id.*)

19

Dr. Julio Pardo assessed Teague's physical residual functional capacity ("RFC") concluding that Teague could occasionally lift or carry up to twenty pounds, could frequently lift or carry up to ten pounds, and could stand or walk for about six hours in an eight hour workday. (R. 768.) Dr. Pardo also concluded that Teague could sit for about six hours in an eight-hour workday and had no limitations in pushing or pulling. (*Id.*) He found no other postural, manipulative, visual, communicative, or environmental limitations. (R. 769-71.) In support of his findings, Dr. Pardo cited Teague's past medical visits for pain, noting that medication had been helpful at times and that she often exhibited full range of motion. (R. 768-69.) He concluded that Teague's statements regarding her physical symptoms were considered partially credible. (R. 772.) The RFC was affirmed on reconsideration on January 26, 2011. (R. 896-98.)

### C. Claimant's Testimony

Teague appeared before the ALJ on February 1, 2012 and testified as follows. She was five feet two inches tall and weighed 195 pounds at the time of the hearing. (R. 37.) She is left handed. (*Id.*) Teague is separated from her husband and lives with her four minor children. (R. 37-38.) She completed two years of college, but did not obtain a degree. (R. 38.) Teague has not worked since July 29, 2007. (R. 39.) She receives Medicaid and food stamps, and received short-term disability in the amount of $17,000 in 2009. (R. 38-39.)

In addition to visits with her primary care physician Dr. Khan, Teague sees Dr. Meresh about once a month for mental health treatment. (R. 40-41.) She testified that she experiences pain in her hands, feet, knees, and hips, which she described as achy and constant, and rated a 7/10. (R. 39.) She had taken pain medication the day prior to

the hearing, which makes her drowsy.  (R. 40.)  She takes her medication infrequently due to the effect it can have on her liver.  (R. 51.)  However, she was still taking Cymbalta for depression despite concerns about her liver function.  (R. 49-50.)  Teague denied using a CPAP machine for sleeping, insulin for diabetes, or taking medicine for a liver disorder or fibromyalgia.  (R. 40, 51.)  She does take medicine for hypertension. (R. 40.)

Teague further testified that she cannot walk a block and has not been able to do so for over a year.  (R.  42.)  She does not use a cane.  (R. 43.)  Teague can stand on her feet for fifteen to twenty minutes at most.  (R. 42.)  She can sit for only thirty minutes if her feet are touching the floor, and forty minutes if her feet are not touching the floor. (R. 42-43.)  These sitting restrictions have been the same for the past year.  (R. 43.) Teague testified that she is unable to lift more than five pounds, though she can lift a gallon of milk.  (*Id.*)  As for mobility in her residence, Teague "scoots" up the stairs and slides down about twice per day.  (*Id.*)  Teague also has difficulty bending, crouching, crawling, and kneeling.  (R. 43.)  She testified that she struggles to reach overhead and in front of her because it hurts to lift her arms.  (R. 43-44.)  It also hurts to squeeze or turn items with her hands.  (R. 44.)

Teague showers herself, but has difficulty getting dressed due to her inability to bend down to tie her shoes or button her shirt.  (R. 44-45.)  She does not change her clothes regularly.  (R. 49.)  Teague can microwave her meals, load a dishwasher, occasionally do laundry, take out a small bag of garbage, and do some dusting.  (R. 45-46.)  She does not make her bed and can only go grocery shopping with assistance. (R. 45.)  Teague's dad, who visits everyday, and her older children do the majority of

21

the cooking and dishes.  (R. 45, 50.)  Generally, Teague does not drive her kids to or from school, help with homework, or attend school events.  (R. 46.)  She drives approximately once every two weeks to take one of her children to school or to doctor's appointments.  (R. 46-47.)  On most weekends, the children are with her parents.  (R. 50.)

Teague testified that she suffers from low self-esteem, difficulty concentrating, memory loss, and crying spells once a day, lasting five minutes to an hour.  (R. 41.)  Teague also suffers from paranoia.  (*Id.*)  She only leaves the house every three days because she gets scared that people are following her or talking about her.  (R. 50-51.)  She also hears voices.  (*Id.*)  When asked what the voices say, Teague responded that first "it's like a burning in my nose," but that she does not remember much after that.  (R. 41-42.)  Teague experiences panic attacks a couple times per week, which last approximately ten to fifteen minutes.  (R. 42.)  During those attacks, she becomes frantic and cries.  (*Id.*)  If her children are home, they try to calm her down; otherwise, she tries to just sit and be still.  (*Id.*)  As for sleep, Teague testified that she is "up and down all night" due to "weird" dreams.  (R. 44.)  She takes medication to help her sleep and usually sleeps about four hours during the day.  (*Id.*)  At least once a week, Teague stays up for twenty-four to forty-eight hours straight.  (R. 49.)

Teague spends most of her time sleeping.  (R. 49.)  She has no hobbies, and only uses the computer about once a month.  (R. 46-48.)  She does not attend church or family gatherings because she gets embarrassed when she cannot recognize people.  (R. 47.)  She occasionally goes out to eat.  (R. 47.)  She explained that she regularly gets into arguments with people because she gets frustrated about her inability to do

22

things.  (R. 51.)

**D.  Vocational Expert's Testimony**

Vocational Expert Edward Pagella (the "VE") also testified at the hearing.  The ALJ first asked the VE to classify Teague's past work.  (R. 53.)  VE Pagella explained that Teague previously worked as a cashier (unskilled/light), tax preparer (semi-skilled/sedentary), billing clerk (semi-skilled/sedentary), and customer service representative (semi-skilled/sedentary).  (*Id.*)

Next, the ALJ asked VE Pagella to assume a hypothetical individual of Claimant's age, education, and work experience who can (1) lift and carry ten pounds occasionally and frequently; (2) stand and/or walk a total of two hours during an eight-hour workday; (3) sit at least six hours during an eight-hour workday; (4) never climb ladders, rope or scaffolding; (5) occasionally climb ramps and stairs; (6) occasionally bend, crouch, kneel, or crawl; (7) who must avoid concentrated exposure to work hazards such as heights and moving machinery; (8) is limited to two or three step, simple, routine tasks; and (9) can come into occasional contact with co-workers or supervisors, but no contact with the public for work related purposes.  (R. 53.)  When asked whether such an individual could perform Claimant's past relevant work, the VE responded in the negative.  (R. 53-54.)  But the individual would be capable of performing work as a hand sorter (1,400 positions in the Chicago area), assembler (3,200 positions), or hand packer (4,300 positions).  (R. 53-54.)  All of those positions are classified as Specific Vocational Preparation level one or two and require frequent use of the hands.  (R. 54, 56.)

The VE did not change his response when the ALJ modified the hypothetical to

23

include frequent use of hands and frequent overhead reaching with both extremities. (R. 54.) Similarly, there was no change to his response for an individual who needed a sit-stand option, *i.e.*, to sit for five minutes for every one to two minutes of standing. (*Id.*) But, if the individual was limited to only occasional use of her hands and occasional overhead reaching, she would be unable to meet the standards for sedentary work and there would be no substantial gainful activity. (*Id.*) The VE further testified that an individual who was off task twenty percent of the workday to nap or who missed four days of work per month would be unable to engage in substantial gainful activity. (R. 55.) Lastly, the VE confirmed that his testimony was consistent with the Dictionary of Occupational Titles, as well as his twenty plus years of placing individuals into occupations. (*Id.*)

## II. LEGAL ANALYSIS

### A. Standard of Review

This court will affirm the ALJ's decision if it is supported by substantial evidence and free from legal error. 42 U.S.C. §405(g); *Steele v. Barnhart*, 290 F.3d 936, 940 (7th Cir. 2002). Substantial evidence is more than a scintilla of evidence; it is "such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Diaz v. Charter*, 55 F.3d 300, 305 (7th Cir. 1995) (*quoting Richardson v. Perales*, 402 U.S. 389, 401, 91 S.Ct. 1420, 28 L.Ed.2d 842 (1971)). We must consider the entire administrative record, but will not "re-weigh evidence, resolve conflicts, decide questions of credibility, or substitute our own judgment for that of the Commissioner." *Lopez v. Barnhart*, 336 F.3d 535, 539 (7th Cir. 2003) (*citing Clifford v. Apfel*, 227 F.3d 863, 869 (7th Cir. 2000)). This Court will "conduct a critical review of the evidence" and

will not let the Commissioner's decision stand "if it lacks the evidentiary support or an adequate discussion of the issues." *Lopez*, 336 F.3d at 539 (*quoting Steele*, 290 F.3d at 940).

In addition, while the ALJ "is not required to address every piece of evidence," she "must build an accurate and logical bridge from the evidence to [her] conclusion." *Clifford*, 227 F.3d at 872. The ALJ must "sufficiently articulate her assessment of the evidence to assure us that the ALJ considered the important evidence … [and to enable] us to trace the path of the ALJ's reasoning." *Carlson v. Shalala*, 999 F.2d 180, 181 (7th Cir. 1993) (per curiam) (*quoting Stephens v. Heckler*, 766 F.2d 284, 287 (7th Cir. 1985)).

### B. Analysis under the Social Security Act

In order to qualify for benefits, a claimant must be "disabled" under the Social Security Act (the "Act"). A person is disabled under the Act if "he or she has an inability to engage in any substantial gainful activity by reason of a medically determinable physical or mental impairment which can be expected to last for a continuous period of not less than twelve months." 42 U.S.C. § 423(d)(1)(A). In determining whether a claimant is disabled, the ALJ must consider the following five-step inquiry: "(1) whether the claimant is currently employed, (2) whether the claimant has a severe impairment, (3) whether the claimant's impairment is one that the Commissioner considers conclusively disabling, (4) if the claimant does not have a conclusively disabling impairment, whether he or she can perform past relevant work, and (5) whether the claimant is capable of performing any work in the national economy." *Dixon v. Massanari*, 270 F.3d 1171, 1176 (7th Cir. 2001). The claimant has the burden of

establishing a disability at steps one through four. *Zurawski v. Halter*, 245 F.3d 881, 885-86 (7th Cir. 2001). If the claimant reaches step five, the burden then shifts to the Commissioner to show that "the claimant is capable of performing work in the national economy." *Id.* at 886.

The ALJ followed this five-step analysis. At step one, the ALJ found that Teague had not engaged in substantial gainful activity since her alleged onset date of July 29, 2007. (R. 20.) At step two, the ALJ determined that Teague suffered from the following severe impairments: fibromyalgia, morbid obesity, depression, and anxiety, in addition to a number of non-severe impairments. (R. 20-22.) Next, at step three, the ALJ concluded that Teague does not have an impairment or combination of impairments that meets or medically equals the severity of one of the listed impairments in 20 C.F.R. Part 404, Subpart P, Appendix 1. (R. 22-24.)

The ALJ went on to assess Teague's RFC, ultimately concluding that she can perform sedentary work as defined in 20 C.F.R. § 404.1567(a), except that she can never climb ladders, ropes, or scaffolds; can only occasionally climb ramps/stairs, balance, stoop, kneel, crouch, and crawl; must avoid concentrated exposure to hazards such as heights and dangerous machinery; and must be able to stand for one or two minutes after sitting for forty-five. (R. 24-28.) The ALJ further concluded that Teague is limited to performing simple, routine, repetitive work involving two to three step tasks, and is precluded from work involving public contact, although she can have occasional contact with co-workers and supervisors. (*Id.*) Based on this RFC, the ALJ found, at step four, that Teague would be unable to perform her past work. (R. 28.) However, at step five, the ALJ determined that considering Teague's age, education, work

experience and RFC, there are jobs that exist in significant numbers in the national economy that she can perform, such as hand sorter, assembler, or hand packer.  (R 28-29.)  As a result, the ALJ concluded that Teague has not been under a disability under the Act from July 29, 2007 through the date of the decision.  (R. 29.)

Teague now argues that the ALJ erred by (1) failing to give the opinion of her treating psychiatrist Dr. Meresh controlling weight; and (2) finding that she did not meet certain mental health related listings.  On the whole, Teague takes issue with the ALJ's treatment of her mental impairments.  Of course, this correlates directly to the ALJ's listing and RFC determinations, and ultimate finding.

### C.  The ALJ Failed to Properly Consider Claimant's Mental Impairments.

Teague first argues that the ALJ erred in giving no weight to the opinion of Dr. Meresh.  As laid out above, in his January 2012 statement, Dr. Meresh opined that Teague would be seriously limited in her ability to perform a number of work functions and completely limited in performing others.  In Dr. Meresh's view, Teague's mental ability and aptitude to do unskilled work ranged from "seriously limited" to "no useful ability to function."  The ALJ decided to afford Dr. Meresh's opinion no weight.  In doing so, she cited to treatment gaps and stated that Dr. Meresh's opinion was internally inconsistent with his own treatment records.  The ALJ also stated that the extent of Teague's daily activities belied Dr. Meresh's assertions of extreme limitations.   Teague takes issue with the ALJ's reasons for discrediting Dr. Meresh's opinion, finding them unsupported by the record.

Generally, the opinion of a treating physician is given controlling weight when it is "well-supported by medically acceptable clinical and laboratory diagnostic techniques

and is not inconsistent with other substantial evidence." 20 C.F.R. § 404.1527(c)(2);

*Punzio v. Astrue*, 630 F.3d 704, 710 (7th Cir. 2011). This is so because treating

sources are likely to be "most able to provide a detailed, longitudinal picture" of a

claimant's impairments. 20 C.F.R. § 404.1527(c)(2). If an ALJ rejects the opinion of a

treating physician, she must offer "good reasons" for doing so. *Campbell v. Astrue*, 627

F.3d 299, 306 (7th Cir. 2010); 20 C.F.R. § 404.1527(c)(2)).

At the outset, we note that treatment gaps do not appear to be a legitimate

reason for rejecting Dr. Meresh's opinion. As claimant points out, she visited Dr.

Meresh or Ms. Kenny (who worked with Dr. Meresh) over fifty times for treatment and

counseling over a span of a few years. While there were some short periods during

which she missed appointments or did not seek treatment, Dr. Meresh and his

colleague Ms. Kenny had ample visits with Teague to assess her symptoms and

limitations. Thus, gaps in treatment is not a good reason for rejecting Dr. Meresh's

opinion.

Notwithstanding that error, the ALJ gave additional reasons for discounting Dr.

Meresh's very restrictive opinion, namely that the opinion was inconsistent with his own

contemporaneous treatment records. Specifically, the ALJ stated:

> Dr. Meresh's own progress notes do not reflect significant dysfunction, but rather
> reflect moderate functional limitations at best. As noted she is assessed at each
> visit, and functionally she falls between a five and an eight; she has never been
> rated as a ten.

(R. 28.) While this statement might misconstrue Dr. Meresh's rating scale, we do agree

that the ALJ was proper in rejecting Dr. Meresh's restrictive opinion of Teague's

functional abilities.

First, it appears that the ALJ (and the Claimant) misunderstood Dr. Meresh's rating scale. The records make clear that at each visit, Dr. Meresh and Ms. Kenny rated Teague's "core and associating symptoms" (such as depression, fatigue, anxiety, etc.) on a scale of zero to ten, with zero meaning no symptoms and ten meaning extreme symptoms. Dr. Meresh and Ms. Kenny also gave Teague an overall functioning rating, which claimant and the ALJ maintained used the same scale. But, as mentioned above (see n.1), the overall functioning rating appears to be inversely related to the symptom ratings. That is, when the symptom ratings increase, the overall functioning ratings decrease. This pattern is maintained consistently throughout the treatment records. Thus, both the ALJ and the claimant appear to have misread the overall function ratings.[2]

In any event, Teague's symptom ratings and overall functioning ratings remained primarily the moderate level, leaving Dr. Meresh's severely restrictive opinion internally inconsistent with his own records. As a result, the ALJ was permitted to reject those findings. *Schmidt v. Astrue*, 496 F.3d 833, 842 (7th Cir. 2007).

It does not follow though that the ALJ was free to disregard the longitudinal treatment records of Dr. Meresh and Ms. Kenny and "cherry-pick" only those records that supported her ultimate decision. Instead, the ALJ was required to consider the entire record. *Diaz*, 55 F.3d at 306, n.2. The Court is concerned the ALJ fell short of that requirement here.

At step two (the listing determination) and in discrediting Teague's testimony

---

[2] Because this case is being remanded, Claimant's counsel shall confirm the proper rating scale for overall functioning and inform the ALJ of his findings.

(and Dr. Meresh's opinion for that matter), the ALJ cited to Teague's daily activities, such as caring for her children, doing household chores with assistance, traveling alone to the consultative evaluation, going on some social outings, and giving birth. In the ALJ's view, such activities belied Teague's allegations of extreme limitations, both mental and physical. But, the Seventh Circuit has repeatedly cautioned ALJs of placing too much weight on daily activities and of ignoring the difference between performing household chores and maintaining full-time employment. *Hughes v. Astrue*, 705 F.3d 276, 278 (7th Cir. 2013) ("We have remarked the naiveté of the Social Security Administration's administrative law judges in equating household chores to employment."). Here, in addition to placing a great deal of weight on Teague's daily activities, the ALJ also ignored *how* Teague performed those activities. There are repeated notations in the record that Teague's parents, husband, and older children often bear the brunt of caring for the younger children and doing household chores. It is also unclear how giving birth correlates to the ability to maintain full time employment. Naturally, after finding herself pregnant, Teague had little choice but to give birth.

Additionally, in discrediting Teague, the ALJ again cited to treatment gaps and missed appointments. As stated above, such instances were few and far between. What is more, the ALJ failed to look into any reasons behind those missed appointments or treatment gaps, ignoring the fact that Teague's depression could certainly play a role in a lackadaisical approach to treatment. *Shauger v. Astrue*, 675 F.3d 690, 696 (7th Cir. 2012) ("An ALJ may need to question the individual at the administrative proceeding in order to determine whether there are good reasons the individual does not seek medical treatment or does not pursue treatment in a consistent

manner."). The ALJ also failed to acknowledge records indicating that Teague heard voices, was recently suffering from increased paranoia, and frequently complained of memory loss and concentration concerns.

All of this leaves the Court questioning whether the ALJ properly considered Teague's mental health impairments. Interestingly, the ALJ acknowledged that her step two determination was not an RFC assessment, which required a more detailed assessment. Yet, we are left wondering whether the ALJ properly accounted for all of Teague's mental impairments in that RFC assessment. The Court is also concerned that the ALJ did not adequately consider the interaction of Teague's chronic pain and depression. *See Martinez v. Astrue*, 630 F.3d 693, 697-98 (7th Cir. 2011). This case is remanded so that the ALJ can properly address these concerns and re-assess step two and the RFC.

## III. CONCLUSION

For the foregoing reasons, claimant's motion for summary judgment is granted and the Commissioner's motion for summary judgment is denied. This case is remanded to the Social Security Administration for proceedings consistent with this Opinion.

**ENTERED:**

_____

**Michael T. Mason**
**United States Magistrate Judge**

**Dated: September 30, 2015**